**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARISOL MALDONADO, Individually** | : | **CIVIL ACTION** |
| **and as Administratrix of the Estate of** | : | |
| **Jonathan Delgado, Deceased** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **WALMART STORE #2141, et al.** | : | **NO. 08-3458** |

**MEMORANDUM AND ORDER**

L. FELIPE RESTREPO                                                    MAY 9, 2011
UNITED STATES MAGISTRATE JUDGE


            Plaintiff, Marisol Maldonado, individually and as the Administratrix of the estate of

Jonathan Delgado, deceased, brings this products liability and negligence action against

Defendants, Walmart Store #2141 and Walmart Stores East, Inc. (hereinafter collectively

referred to as "Wal-Mart" or "Defendant").[1]  (See Pl.'s Compl.)  The action arises out of the

near-drowning and subsequent death of Plaintiff's son Jonathan Delgado in an above-ground,

inflatable swimming pool sold by Defendant.  Presently before the Court are Defendant's

Daubert motions to preclude the testimony at trial of Plaintiff's experts, Alison Osinski (Doc.

No. 38) (hereinafter "Def.'s Mot. No. 38"), and Erika Taylor (Doc. No. 39) (hereinafter "Def.'s

Mot. No. 39"), as well as Defendant's Motion for Summary Judgment (Doc. No. 40).[2]

---

[1] Plaintiff's complaint also brings claims for wrongful death, survival, and negligent
infliction of emotional distress; Plaintiff further seeks punitive damages.  (Pl.'s Compl. 9-13.)

[2] Federal jurisdiction in this case is based on diversity of citizenship under 28 U.S.C. §
1332.  Pursuant to Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), this Court will apply
Pennsylvania substantive law in deciding Defendant's Motion for Summary Judgment.

In deciding said motions, the Court has also considered Plaintiff's responses (Doc. Nos. 42, 43) (hereinafter "Pl.'s Resp. No. 42" and "Pl.'s Resp. No. 43") and Defendant's reply briefs (Doc. Nos. 46, 47, 48). Oral argument was held before the Court on January 5, 2011, and with the Court's permission, Plaintiff thereafter submitted a Supplemental Brief (Doc. No. 51) in support of her position. For the reasons that follow, Defendant's motions will be granted.

## I. BACKGROUND

The facts of this case are unquestionably tragic. Plaintiff, Marisol Maldonado (hereinafter "Ms. Maldonado"), is the mother of the decedent, Jonathan Delgado (hereinafter "Jonathan"). In July 2006, Ms. Maldonado lived in the Northeast section of Philadelphia and had five children, including a son Danny, who was four years old and suffered from autism, and Jonathan, who was her youngest at fifteen months old. (Pl.'s Dep. 10-12; Pl.'s Resp. No. 42, Ex. H "Child Drowning Update.") Jonathan and Danny both resided with Ms. Maldonado. (Pl.'s Dep. 10-11.)

The July 28, 2006 event that gave rise to the instant case took place at the home of Ms. Maldonado's sister, Diane Maldonado (hereinafter "Diane"), and her husband, Robert "Bob" Yeager (hereinafter "Mr. Yeager"). (Pl.'s Resp. No. 42 at 3 ¶ 10; Diane Dep. 10, Sept. 4, 2009.) Diane and Mr. Yeager also resided in Northeast Philadelphia with their five children. (Diane Dep. 10-11.) Their home had a backyard that was approximately twenty feet wide by thirty-six to thirty-eight feet long. (Yeager Dep. 32, Jan. 29, 2009.) The kitchen, located in the rear of the house, had a back door with two locks. (Yeager Dep. 33, Sept. 4, 2009; Pl.'s Dep. 35, Sept. 4, 2009.) From the back door, a set of four concrete stairs led down to the yard. (Yeager Dep. 11, 9/4/2009; Diane Dep. 32-33.) A concrete landing pad stood at the bottom of the stairs. (Diane

2

Dep. 33.)  Wooden decking lay beyond the landing pad, followed by one step up to a lawn area.

(Diane Dep. 33-34.)  On the lawn, approximately twenty feet from the back door, Diane and Mr.

Yeager had an inflatable, above-ground swimming pool that they purchased in 2005.  (Diane

Dep. 12, 34-35; Yeager Dep. 11, 9/4/2009.)

The backyard also had a fence, which was installed by Mr. Yeager around the time of the

pool purchase.  (See Diane Dep. 55-58.)  Mr. Yeager believed he was familiar with

Philadelphia's building codes for fencing around pools, based on his training and experience in

construction, so he did not conduct research into those requirements.  (Yeager Dep. 12-14,

9/4/2009.)  As of July 2006, Mr. Yeager understood the City of Philadelphia to require a six-foot

fence around the perimeter of the pool.  (Id. at 14.)  An engineering report prepared in August

2010 at the request of Defendant confirms that the fence complied with Philadelphia's

requirements.  (Pl.'s Resp. No. 42, Ex. U at 5.)

Diane and Mr. Yeager originally purchased the inflatable pool at a Wal-Mart store

located on Columbus Boulevard in May 2005.  (Diane Dep. 12, 15; Def.'s Mot. Summ. J. 5 ¶

24.)  Diane went to Wal-Mart with the intent of purchasing a specific size of inflatable pool at a

specific price of $200, but without a particular brand of pool in mind.  (Diane Dep. 12-13, 16.)

She found a pool on clearance that fit her criteria and purchased the pool that day.  (Id. at 16-21.)

Diane did not ask anyone at Wal-Mart about the pool before the purchase, (id. at 17), and no

Wal-Mart employee made any representations to Diane about what was included in the pool box

or what might be needed to use the pool aside from what was included in the box.  (Id. at 19-21.)

The pool was sold in a large white box, which included on a side of the box a picture of a

family playing in and around the pool.  (Yeager Dep. 7, 1/29/09.)  In addition to the inflatable

pool itself, the pool box contained a filter pump system, filter cartridge, ladder, ground cover,

debris cover, maintenance kit, and instructions. (Pl.'s Resp. No. 42, Ex. P.) A number of warnings were printed on the ladder, on the pool itself, and in the pool instructions.[3] (See id.)

When Mr. Yeager first assembled the pool in 2005, he believed the set-up process was self-explanatory. (Yeager Dep. 20, 25, 9/4/2009.) He did not read the instructions as to how to inflate the pool; he only read the instructions on how to assemble and install the ladder. (Id.) Mr. Yeager remembered the instructions contained a warning to check local building codes, but he believed he was familiar with the codes in Philadelphia. (Id. at 21, 24.) Mr. Yeager took the pool down at the end of the season in 2005 and then assembled it again himself the following year. (See id. at 18-19.)

On July 28, 2006, at around 4:00 p.m., Diane arrived at Ms. Maldonado's home with Ms. Maldonado's son Jonathan and picked up Ms. Maldonado, a friend Tania Garcia[4], and two more of Ms. Maldonado's children: Danny and Gabriel. (Pl.'s Dep. 30-32.) Diane brought them all to her home in Northeast Philadelphia. (Pl.'s Dep. 31.) Diane's husband, Mr. Yeager, was also at the home. (Pl.'s Dep. 32.) At some point after everyone arrived at the house, Diane and Mr.

---

[3] Wal-Mart's inflatable pool contained numerous warnings – on the pool itself, in the instructions, and on the ladder – of the danger the pool posed to an unsupervised child. On the outside of the pool, printed on the top inflatable ring, relevant warnings read as follows: "DANGER: USE ONLY UNDER COMPETENT SUPERVISION. POOL FENCING LAWS AFFECT THIS PRODUCT, CONSULT YOUR LOCAL COUNCIL. NEVER LEAVE YOUNG CHILDREN UNATTENDED." A slightly smaller warning underneath read: "NOT SUITABLE FOR CHILDREN UNDER 36 MONTHS, CONTAINS SMALL PARTS. FOLLOW THESE RULES TO AVOID DROWNING, PARALYSIS, OR OTHER SERIOUS INJURY." (Pl.'s Resp. No. 42, Ex. P (capitalization in original).) A sticker on the pool ladder contained a warning that stated "Remove ladder when pool is not in use – Prevent unauthorized entry." (Id.) The same warning was printed in the ladder set-up instructions. (Id.)

[4] Ms. Garcia's name is spelled "Tania" and "Tanya" throughout the record. She will be referred to as "Ms. Garcia" for the remainder of this memorandum.

Yeager took their nephew Gabriel with them to pick up pizza for the family. (Pl.'s Dep. 33; <u>see also</u> Yeager Dep. 26-29, 9/4/2009.)

After they left, Ms. Maldonado went from the living room into the kitchen where her children, Danny and Jonathan, and her friend, Ms. Garcia, were already located, (Pl.'s Dep. 34); Jonathan was drinking a bottle in the kitchen, (Pl.'s Dep. 34, 36). Ms. Maldonado then told Ms. Garcia that she had to use the bathroom and asked Ms. Garcia to watch the children. (Pl.'s Dep. 34.) Ms. Garcia was sitting at the kitchen table talking on the phone, so Ms. Maldonado repeated her request three times. (Pl.'s Dep. 34-35.) Ms. Garcia later reported to police that she did not know whom Ms. Maldonado had asked to supervise the children when Ms. Maldonado went to the bathroom because Ms. Garcia was on the phone. (Pl.'s Resp. No. 42, Ex. H "Investigation Interview Record: Tania Garcia.") By the time Ms. Maldonado went up to the bathroom, Danny had left the kitchen and was in the backyard. (Pl.'s Dep. 35-36.)

When Ms. Maldonado left to go upstairs, the back door was closed. (Pl.'s Dep. 38.) Ms. Maldonado was on the second floor of the house using the bathroom when she heard a splash. (Pl.'s Dep. 40.) She looked out the bathroom window, which faced the backyard, but saw nothing. (Pl.'s Dep. 40-42.) Ms. Maldonado ran downstairs and asked Ms. Garcia about Jonathan, but Ms. Garcia was unresponsive, (Pl.'s Dep. 40, 48), so Ms. Maldonado began searching for Jonathan, (Pl.'s Dep. 48).

After looking in the front, on either side, and inside of the house for a second time, Ms. Maldonado looked for Jonathan in the backyard. (Pl.'s Dep. 48-49.) She first discovered her son, Danny, playing in the dirt. (Pl.'s Dep. 49.) Then, upon passing the pool, Ms. Maldonado noticed Jonathan floating sideways with his head to the side, stuck under the rim of the pool. (Pl.'s Dep. 49, 52, 54-55.) Ms. Maldonado went over to the pool, took him out, and began to

administer mouth-to-mouth resuscitation. (Pl.'s Dep. 49.) Ms. Maldonado's neighbor, John Caldwell, heard her screaming, came into the backyard, and resumed mouth-to-mouth and CPR. (Pl.'s Resp. No. 42, Ex. H "Investigation Interview Record: John Caldwell.") Jonathan was rushed to St. Christopher's Hospital where he spent five days; he was pronounced dead on August 2, 2006. (Pl.'s Dep. 57-58; Pl.'s Resp. No. 42 at 6 ¶ 19.)

No adult observed how Jonathan was able to leave the house or traverse the backyard; moreover, no adult observed how Jonathan was able to enter the pool or what happened before Ms. Maldonado discovered him in distress.[5] (See Pl.'s Resp. No. 42 at 8 ¶ 23.) Mr. Yeager recalled that when he left the house, the pool ladder was in the pool. (Yeager Dep. 36, 9/4/2009.) Diane believed the ladder was not in the pool, but rather laying down in the backyard.[6] (Diane Dep. 70, 9/4/2009.) Prior to the incident, Ms. Maldonado had not allowed Jonathan to play in the pool or enter the backyard alone. (Pl.'s Dep. 24; Pl.'s Resp. No. 42 at 8 ¶ 22.)

Ms. Maldonado brought this action on June 19, 2008, alleging, among other claims, strict products liability, negligence and negligent product design against Wal-Mart for its design, marketing, and sale of its inflatable, above-ground pool product. (Pl. Resp. No. 42 at 22; see also Pl.'s Compl.) Plaintiff contends, inter alia, that the pool design made it "highly probable" that a toddler would "get into the pool unnoticed and drown," that the labels, instructions, and packaging contained inadequate warnings, and that the marketing and advertising misled

---

[5] Ms. Maldonado believes she asked her son, Danny, who was in the backyard at the time of the incident, how Jonathan entered the pool, but Danny was unable to tell her. (Pl.'s Dep. 56.)

[6] Diane testified that photographs taken after the incident show the ladder in the pool because she put the ladder back in the pool after a police photographer asked her to move it so he could walk by. (Diane Dep. 70-71.)

customers into believing the pool was safe. (Pl.'s Compl. 5-6.) Defendant argues that summary judgment is warranted with respect to Plaintiff's claims because Plaintiff has failed to produce evidence that: (1) Jonathan Delgado was an intended user of the pool; (2) any alleged defect was the proximate cause of Jonathan Delgado's death; and (3) any additional warnings or instructions would have prevented Jonathan's death and/or unobvious risk existed. (Defs. Mot. Summ. J. 8.) Defendant further argues summary judgment is warranted as to Plaintiff's negligence claims because Plaintiff has produced inadequate evidence that the alleged defects caused Jonathan's injuries. (Id. at 11.)

Ultimately, Defendant's motion for summary judgment hinges on whether Plaintiff can prove that the inflatable pool was defective and actually caused Jonathan's injuries. Plaintiff proffers two experts, Dr. Alison Osinski and Ms. Erika Taylor, who are prepared to testify to both the defective condition of the pool and the cause of Plaintiff's injuries. (See Pl.'s Resp. No. 43.) Defendant Wal-Mart contends that the testimony of both experts, which would be based on the expert reports provided by each, is inadmissible. (See Def.'s Mot. No. 38; Def.'s Mot. No. 39.) The experts' respective reports are discussed in more detail below.


## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue" is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it could impact the holding of the case under the governing law. Id.

When deciding a motion for summary judgment, a court must draw all reasonable inferences and view all facts in the light most favorable to the non-moving party. Id. at 255; Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005) (citations omitted); see also United States v. Diebold, Inc., 369 U.S. 654 (1962). A Court may grant summary judgment if it determines that, after reviewing the evidence and making all inferences in favor of the non-moving party, there is no genuine issue of material fact to warrant a trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden to demonstrate that there are no facts on record that support the non-moving party's position. Id. at 322-24. If the moving party successfully carries this burden, the non-moving party must then set forth specific facts showing the existence of a genuine issue for trial. Fed. R. Civ. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, Matsushita, 475 U.S. at 586-87; she must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324.

**B. Expert Testimony**

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

According to the mandate of Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), it is the responsibility of the trial judge to serve as a "gatekeeper" to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable."[7] Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997). A District Court is granted wide discretion when determining whether to admit or exclude expert testimony. Hamling v. United States, 418 U.S. 87, 108 (1974). The proponent of the expert testimony must meet this burden "by a preponderance of proof." Oddi, 234 F.3d at 144; Daubert, 509 U.S. at 593.

Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted). A trial court must exclude expert testimony that does not meet these three requirements. Id. at 404 (citing Daubert, 509 U.S. at 592).

In order for a court to deem a witness "qualified," he or she must possess specialized expertise. Schneider, 320 F.3d at 404. The Third Circuit interprets this requirement liberally, finding that "a broad range of knowledge, skills, and training qualify an expert as such." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). This "liberal policy of admissibility extends to the substantive as well as the formal qualification of experts." Id. More

---

[7] Daubert was decided in the context of scientific knowledge; however, it has since been extended in Kumho Tire Co., v. Carmichael, 526 U.S. 137 (1999), to "technical or other specialized knowledge." Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000).

generalized qualifications will often satisfy this requirement, and the court should not impose overly rigorous requirements of expertise. Id. "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996). At minimum, however, "a proffered expert witness . . . must possess skill or knowledge greater than the average layman." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000) (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)).

Under the second requirement of Rule 702, "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Paoli, 35 F.3d at 742. To be "reliable," the testimony must be based on the "methods and procedures of science," rather than on "subjective belief or unsupported speculation." Paoli, 35 F.3d at 744 (citing Daubert, 509 U.S. at 590). "The evidentiary requirement of reliability is lower than the merits standard of correctness." Id. In other words, a litigant need not prove that an expert's opinions are *correct*, she need only prove that they are *reliable*. Nevertheless, the litigant must make more than a prima facie showing that her expert's methodology is reliable in order to meet the "reliability" requirement of Rule 702. Id. at 743.

When assessing the "reliability" of an expert's testimony under Rule 702, a court should consider the following: (1) whether the expert's methods consist of a testable hypothesis – whether it can be and has been tested; (2) whether the method has been subject to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the expert's method is generally accepted; (6) the relationship of the technique used to methods already established to be reliable;

(7) the expert's qualifications based on the methodology; and (8) the non-judicial uses to which the method has been put. <u>Paoli</u>, 35 F.3d at 742 n.8; <u>Pineda</u>, 520 F.3d at 247-48. This list of factors is "neither exhaustive nor applicable in every case." <u>Pineda</u>, 520 F.3d at 248 (quoting <u>Kannankeril</u>, 128 F.3d at 806-07). A court has discretion to consider any other relevant factors as well. <u>See</u> <u>Elcock</u>, 233 F.3d at 746.

Finally, under Rule 702, an "expert's testimony must be relevant for the purposes of the case and must assist the trier of fact," <u>Schneider</u>, 320 F.3d at 404; in other words, the testimony "must fit the issues in the case." <u>Id.</u> "[E]ven if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*." <u>Paoli</u>, 35 F.3d at 743 (emphasis in original). To determine if evidence meets this "fit" requirement, a court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." <u>Heller v. Shaw Indust., Inc.</u>, 167 F.3d 146, 153 (3d Cir. 1999). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>General Elec. v. Joiner</u>, 522 U.S. 136, 146 (1997).

In general, the Federal Rules of Evidence "embody a strong preference for admitting any evidence that may assist the trier of fact." <u>Johnson v. SJP Mgt. LLC</u>, No. 07-5545, 2009 WL 367539, at *5 (E.D. Pa. Feb. 12, 2009) (citing <u>Kannankeril</u>, 128 F.3d at 806). Nevertheless, the Third Circuit has excluded expert testimony when it does not meet the factors outlined in <u>Daubert</u>. For example, in <u>Oddi v. Ford Motor Co.</u>, Mr. Oddi suffered serious injuries when the bread truck he was driving struck a guardrail and bridge abutment, piercing the floor of the truck's cab. <u>Oddi</u>, 234 F.3d at 140. Mr. Oddi sued Ford Motor Company, which manufactured

the truck, alleging that the design of the truck's front bumper was defective because it allowed the underside of the truck to "ramp" onto the guardrail and strike the bridge abutment.  Id.

Mr. Oddi offered the expert testimony of engineer John Noettl to support his design defect claim.  Id.  Noettl's expert report concluded that the bumper and floor board designs were defective.  He found that if the bumper and floor board had been "properly structurally designed," the truck would not have ramped onto the guardrail, nor would the cab have been pierced by the guardrail and bridge abutment.  Id. at 146-47.  Noettl testified that this opinion was based in part on his review of accident reports, photographs, witness statements, medical records, and Mr. Oddi's own deposition testimony.  Id. at 148.  Noettl stated that his opinion was also based on his experience, academic training, and regular review of technical literature.  Id.

The Third Circuit ultimately upheld the decision of the District Court to exclude Noettl's testimony under Federal Rule of Evidence 702 and Daubert, finding that the plaintiff did not carry his burden to show that Noettl's testimony was based on reliable methodology.  Id. at 158.  The Court cited to Noettl's failure to conduct any independent tests or calculate any of the forces on Mr. Oddi or the truck during the incident, finding that Noettl "used little, if any, methodology beyond his own intuition."  Id.  The Oddi court stated:

> There is nothing here to submit to peer review, and it is impossible to ascertain any rate of error for Noettl's assumptions about the forces that caused Oddi's horrific injuries. Similarly, no standards control his analysis, and no "gatekeeper" can assess the relationship of Noettl's method to other methods known to be reliable and the non-judicial uses to which it has been put.

Id.  In the end, the Court held that Noettl's *ipse dixit* testimony, based on nothing more than his training and experience as an engineer, could not withstand Daubert scrutiny.  Id.; see also

Elcock, 233 at 750 (finding that testimony of a rehabilitation expert was not reliable under Daubert).

Several courts in this District have also excluded expert testimony based on insufficient evidence of reliability in cases quite similar to the case now before the Court: those in which the grant of summary judgment hinges on the admissibility of expert testimony to prove product defect and causation of a victim's injuries. For instance, in Booth v. Black & Decker, 166 F. Supp. 2d 215, 216-17 (E.D. Pa. 2001), the plaintiffs brought suit against a toaster oven manufacturer alleging that a defect in the toaster caused a fire that damaged their home.

To prove that the toaster was damaged and actually caused the fire, the plaintiffs offered the testimony of an expert witness, who advanced two theories as to how the product may have been defective. Id. at 217-18. The Court held that the expert failed to provide sufficient evidence for the Court to conclude that his methodology was reliable and therefore, his testimony would be excluded. Id. at 219. The Court pointed to the fact that the expert "offered no methodology at all for his design defect theory." Id. at 221. The expert

> performed no tests of his own to determine whether his hypotheses were indeed true; he merely examined the toaster oven and concluded it could have been safer. His testimony, like that of the expert in Oddi, seemed wholly based on his own training and experience, and he provided the Court with no objective anchor for his conclusions.

Id.; see also Johnson, 2009 WL 367539, at *10-*14 (holding that expert testimony must be excluded because opinions were not "grounded on any testing, observation, or inspection"); Chester Valley Coach Worlds v. Fisher-Price, No. 99-4197, 2001 WL 1160012, at *13 (E.D. Pa. Aug. 29, 2001) (excluding expert testimony due to the absence of any generally accepted methodology in support of the expert's conclusions).

### III. Challenged Expert Reports

**A. Dr. Alison Osinski**

Dr. Osinski's expert report begins with an approximately one-page description of her education, background, and experience as an aquatics consultant. (Pl.'s Resp. No. 43, Ex. B at 1-2.) The report goes on to provide a very extensive list of "opinions" formulated by Dr. Osinski, based on her review of documents and discovery materials supplied by Plaintiff's counsel, relevant reference materials, and presumably her own education, training and experience. (Id. at 3-8.) The pertinent documents and discovery materials, according to Dr. Osinski, included: (1) statements made by various parties including family members; (2) deposition transcripts; (3) law enforcement reports; (4) photographs of the scene; and (5) pool assembly and operation instructions. (Id. at 2.)

Much of the first two pages of Dr. Osinski's "opinions" listed in the report are simply a recitation of the undisputed facts of this case, including the events leading up to the discovery of Jonathan in the pool. (Id. at 3-4.) But Dr. Osinski then offers several opinions as to the possible causes of Jonathan's near-drowning. (Id. at 4-5.) Perhaps most notably, Dr. Osinski states:

> It is uncertain how Jonathan was able to enter the pool. Given his age, height, and limited physical capabilities, the possibilities are somewhat limited. Jonathan was able to either climb up the sides of the pool, climb onto adjacent objects or structures and fell into the pool, or used the ladder to access the pool.

(Id. at 5.) She further opines, "The precipitating event which led to the drowning was most likely entrapment between the inflated ring and the vinyl pool material. . . .Certain causes can be ruled out. . . . And, there is no indication that cramps, shallow water blackout, head or spinal injury, sudden cardiac emergency, or seizure, were possibilities." (Id. at 4.)

Dr. Osinski's expert report then discusses the details and deficiencies of: the pool sales methods at issue in this case; the instructions included with inflatable ring pools; the ladder included with the pool; and the warning labels on the pool and ladder. (Id. at 5-8.) Finally, Dr. Osinski concludes "[t]he inflated ring pool was defectively designed and not safe for its intended use. Effective barriers and multiple layers of protection could have prevented this tragedy when a momentary failure of adult supervision occurred." (Id. at 8.)

**B. Ms. Erika Taylor**

After providing a short summary of her background and experience, Ms. Taylor's expert report cites a number of general statistics pertaining to the drowning risk posed to children by pools and spas. (Pl.'s Resp. No. 43, Ex. D at 2.) For example, Ms. Taylor states that "[d]rowning is the second leading cause of accidental death for children under the age of five." (Id.) Her report goes on to provide very general information about the dangers posed by above-ground pools, pool safety regulations that exist in some jurisdictions, and the flaws in the pool sales practices of "big-box" retailers. (Id. at 2-3.) Next, the report details certain safety measures or "layers of protection" that, according to Ms. Taylor, would have prevented past pool accidents if they were utilized by pool owners. (Id. at 3.)

Finally, the report concludes with the following statement:

> It is my opinion, based upon my education, training, research, knowledge and the information provided about this case, *that Wal-Mart was negligent in the manner in which it sold this inflatable ring pool to the homeowner in early summer of 2005.* Wal-Mart's failure to ensure that the homeowner was adequately informed about safety devices and layers of safety which were required to make the subject pool safe and provision of safety measures in the "big box" itself contributed to cause the tragic

15

> near-draining [sic] and subsequent death of 15-month-old Jonathon
> [sic] Delgado on July 28, 2006.

(Id. at 3-4 (emphasis added).)

Ms. Taylor states in her expert report that the report itself is based on her research on the way above-ground pools function in the marketplace and on her "general expertise," developed throughout the course of her employment as the editor of the semi-monthly publication <u>Pool and Spa News</u>. (Id. at 1-2.) Plaintiff acknowledges that Ms. Taylor did not review *any* evidence related to this case in preparing her report. (Summ. J. Mot. Hr'g Tr. 28-29, Jan. 5, 2011.)

## IV. ANALYSIS

### A. Defendant's <u>Daubert</u> Motion to Exclude the Testimony of Dr. Alison Osinski

Defendant contends that the Court should exclude the testimony of Dr. Alison Osinski because it does not meet the <u>Daubert</u> standard for reliability.[8] (Def.'s Mot. No. 38 at 6-10.) In particular, Defendant argues that Dr. Osinski's conclusions about what led to Jonathan Delgado's drowning are not based in fact and are not supported in Dr. Osinski's expert report by any analysis or methodology. (Id. at 7.) Plaintiff counters that Dr. Osinski reviewed and "studied the matter in detail and in depth" and did extensive research on the subject before coming to any conclusions. (Pl.'s Resp. No. 43 at 19.) For the reasons that follow, the Court finds that Dr. Osinski's testimony will not satisfy <u>Daubert</u> and therefore must be excluded.

As noted earlier, the Court considers the following factors in a <u>Daubert</u> admissibility inquiry: (1) whether the expert's methods consist of a testable hypothesis – whether it can be and has been tested; (2) whether the method has been subject to peer review and publication; (3) the

---

[8] Defendant does not challenge Dr. Osinski's qualifications as an aquatics expert. (Def. Mot. No. 38.)

known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the expert's method is generally accepted; (6) the relationship of the technique used to methods already established to be reliable; (7) the expert's qualifications based on the methodology; and (8) the non-judicial uses to which the method has been put. Paoli, 35 F.3d at 742 n.8; Pineda, 520 F.3d at 247-48. Given Dr. Osinski's failure to test or independently investigate the cause of Jonathan's injury, her expert opinion fails to satisfy the Daubert standard for admissibility based on these factors.

Dr. Osinski's report stated clearly that the opinions provided in her report were based on her own education, training, and experience, as well as documentation provided by Plaintiff's counsel: statements from family members, deposition transcripts, law enforcement reports, photographs of the scene, and the pool instructions. (Pl.'s Resp. No. 43, Ex. B at 2-3.) After reviewing these materials, Dr. Osinski put forth the following hypotheses, among others, to explain Jonathan's injuries: (1) in order to gain entry to the pool, Jonathan either climbed up the sides of the pool, climbed onto adjacent objects or structures and fell into the pool, or used the ladder to access the pool (id. at 5); (2) once in the pool, Jonathan's drowning was "most likely" due to "entrapment between the inflated ring and the vinyl pool material," (id. at 4); and (3) "[e]ffective barriers and multiple layers of protection could have prevented this tragedy when a momentary failure of adult supervision occurred," (id. at 8).

Dr. Osinski's conclusion about how Jonathan entered the pool begins with a frank admission that "[i]t is uncertain how Jonathan was able to enter the pool." (Id. at 5.) Nevertheless, she goes on to offer three *potential* scenarios that would explain Jonathan's entry. (Id.) Dr. Osinski arrives at these three possibilities by simply considering Jonathan's age, height, and physical capabilities. (Id. at 5.)

Dr. Osinski's report reflects that she did not conduct any independent investigation as to her theories on how Jonathan entered the pool, and that she did not perform any testing of her hypotheses to determine their validity. She did not claim to have inspected the particular inflatable pool in which the incident occurred or any related equipment. She did not inspect the Yeager's yard or the particular area surrounding the pool. In fact, the record does not reflect any visit by Dr. Osinski to the site of the incident. Even without access to the particular pool at issue, Dr. Osinski could have tested her hypotheses on another specimen of the pool model in question to determine if a child of Jonathan's age and stature could even successfully climb the sides of the pool or ascend the ladder in order to enter the pool. But she does not claim to have done so.

Dr. Osinski's hypothesis as to how Jonathan may have nearly drowned *once he entered* the pool suffers from the same lack of independent investigation and testing as her conclusions about how Jonathan gained entry initially. She did not test whether a small child *could* actually become entrapped between the inflatable ring of the pool and the vinyl pool material, as she suggested. She did not test whether a child of Jonathan's age and stature could easily extricate himself from such a situation if he did manage to become entrapped. And she did not test or investigate whether such entrapment actually *caused* Jonathan's injuries; Jonathan may have become entrapped *after* the injuries leading to his death had already taken place. Dr. Osinski's final broad hypothesis – that barriers and "multiple layers of protection" could have prevented Jonathan's injuries – also amounts to speculation, as she cites to no literature, testing, or other evidence to show that in this case, additional safety measures would have prevented Jonathan's injuries and death.

In <u>Daubert</u>, the Supreme Court noted that "a *key* question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." <u>Daubert</u>, 509 U.S. at 593 (emphasis added). The Third Circuit subsequently emphasized in <u>Oddi</u> the importance of such testing to the reliability of an expert's conclusions. <u>See Oddi</u>, 234 F.3d at 156-58. Because Dr. Osinski failed to test her hypotheses, she has failed to satisfy the first <u>Daubert</u> factor. <u>See, e.g.</u>, <u>id.</u> at 156-58 (finding that because expert did not test his hypotheses, he had not satisfied the first <u>Daubert</u> factor); <u>Booth</u>, 166 F. Supp. 2d at 221-22 (holding that because expert performed no tests of his own, his testimony was unreliable). And because Dr. Osinski has failed to conduct such testing, and therefore cites to no methodology, she cannot satisfy the remainder of the <u>Daubert</u> factors designed to evaluate the adequacy and reliability of such methodology. In fact, Dr. Osinski did not even cite to any particular pieces of literature to support her opinion as to the precipitating event she claims led to Jonathan's near-drowning. "Although <u>Daubert</u> does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony, it does require more than [a] haphazard, intuitive inquiry . . ." <u>Oddi</u>, 234 F.3d at 156.

Finally, Dr. Osinski's qualifications as an aquatics expert do not enhance the reliability of her conclusions as to what may have led to Jonathan's drowning. Her report indicates that she arrived at her conclusion that entrapment "most likely" caused Jonathan's drowning by ruling out certain causes, such as environmental conditions or medical conditions. (<u>See</u> Pl.'s Resp. No. 43, Ex. B at 4.) However, Dr. Osinski is not a medical expert, nor did she purport to review any medical records in this case. (<u>See id.</u> at 2.) Any conclusions about what medical causes of death could be ruled out, therefore, appear to be based on speculation alone.

In sum, Dr. Osinski's opinions as to what caused Jonathan's near-drowning and death do not derive from any testable hypotheses. As in Oddi, Plaintiff cannot establish the existence of any methodology used by Dr. Osinski, let alone establish its reliability. See Oddi, 234 F.3d at 156. To be admissible, an expert's report simply cannot be based on unsupported speculation or conjecture. Oddi, 234 F.3d at 158. In this case, Dr. Osinski's testimony is merely *ipse dixit*; therefore, it cannot withstand Daubert scrutiny and will not be admitted.

**B. Defendant's <u>Daubert</u> Motion to Exclude the Testimony of Erika Taylor**

Defendant argues that Plaintiff's second proffered expert witness, Ms. Erika Taylor, also should not be permitted to testify as an expert because: (1) she is not qualified; (2) her opinions lack any factual basis and are based on inapplicable standards and therefore unreliable; and (3) because her testimony is founded in speculation. (Def.'s Mot. No. 39 at 6-11.) Plaintiff responds that Ms. Taylor is qualified as a specialist in "drowning prevention issues," and that the statistics provided in her expert report would provide helpful context to the jury regarding Wal-Mart's "product and conduct and knowledge." (Pl.'s Resp. No. 43 at 7-8.) At oral argument, Plaintiff's counsel elaborated that they sought the admission of Ms. Taylor's testimony to "educate the jury concerning the nature and extent of the hazards and what the knowledge within the industry is about the hazards and what the industry understands are the proper and safe methods for reducing or eliminating those hazards." (Summ. J. Mot. Hr'g Tr. 28.) For the reasons that follow, the Court will exclude the testimony of Ms. Taylor because her testimony will not assist the jury in this case.

*(1) Qualifications*

Defendant contends that Ms. Taylor does not meet the Rule 702 standard for qualification in the area of pool sales.  (Def.'s Mot. No. 39 at 10-11.)  Further, Defendant argues that Ms. Taylor was not qualified to provide an expert opinion that Defendant was negligent, as Ms. Taylor is not a legal expert.  (Id.)  Plaintiff responds that Ms. Taylor, as the editor of the semi-monthly publication Pool & Spa News and through her attendance at seminars and other educational events, has developed a specialty in drowning prevention issues.  (Pl.'s Resp. No. 43 at 7.)

According to her resumé, Ms. Taylor graduated with an associate's degree from West LA College in 1998 and a bachelor's degree from California State University Dominguez Hills in communications in 2001.  (Pl.'s Resp. No. 43, Ex. C.)  She worked in various writing, journalism, and research positions from 1993 until starting with Pool & Spa News in 2001.  (Id.)  Since March 2002, Ms. Taylor has served as the editor of Pool & Spa News.  (Id.)

Ms. Taylor's resumé states that she has "attended thousands of hours of seminars and other educational forums pertaining to the design, construction, repair, and maintenance of pools . . . ."  (Id.)  Further, her resumé reports that she was involved with "conduct[ing] extensive research on drowning and near-drowning incidents and complet[ing] more than 100 interviews."  (Id.)  Her expert report also cites experience in safety issues pertaining to above-ground pools and research on the way above-ground pools function in the marketplace.  (Pl.'s Resp. No. 43, Ex. D. at 1-2.)

In light of her professional training, education, and experience in her role at Pool & Spa News, the Court is satisfied that Ms. Taylor possesses knowledge beyond the "average layman" in the areas of pool design, construction, and safety issues.  Particularly in light of the liberal standard for qualification, the Court concludes that Ms. Taylor is preliminarily and generally

21

qualified to testify at trial as an expert witness on the subjects of pool design, construction, and safety. As will be explained in more detail below, however, the Court finds that Ms. Taylor's testimony will be excluded because it does not satisfy the remaining requirements of Rule 702 and Daubert.

*(2) Reliability and fit*

Defendant argues that Ms. Taylor's testimony would also not satisfy the second two prongs of Daubert for a number of reasons. First, Defendant argues that the standards and requirements cited in Ms. Taylor's report do not govern the parties in this case. (Def. Mot. No. 39 at 6-10.) Defendant further reasons that because Ms. Taylor did not review any of the facts or data in this case, her report cannot assist the trier of fact. (Id. at 10.) Finally, Defendant contends that Ms. Taylor's report is based on her own speculation, because no one knows how Jonathan entered the pool. (Id. at 11.) Although Plaintiff does not directly argue in support of the reliability of Ms. Taylor's report, Plaintiff responds that Ms. Taylor's testimony will put the "Wal-Mart sale in context and will adequately educate the jury that these consumer products are not toys . . . and families with young children should be fully advised in what the hazards are and how to protect the children in the families which are Wal-Mart's target market. . . ." (Pl.'s Resp. No. 43 at 10.)

Ms. Taylor's conclusions regarding Wal-Mart's negligence and the cause of Jonathan Delgado's death[9] cannot pass Daubert scrutiny because they are not grounded in the facts or

_____

[9] As noted in detail above, Ms. Taylor opines in her expert report that "Wal-Mart was negligent in the manner in which it sold this inflatable ring pool to the homeowner in early summer of 2005." Ms. Taylor goes on to state that "Wal-Mart's failure to ensure that the homeowner was adequately informed about safety devices and layers of safety . . . contributed to cause the tragic near [drowning] and subsequent death of . . . Jonathon [sic] Delgado." (Pl.'s Resp. No. 43, Ex. D. at 3-4.)

evidence of this case. Plaintiff has stated as much in open court, admitting that Ms. Taylor did not review *any* evidence in this case when forming her opinions. (Summ. J. Mot. Hr'g Tr. 28-29.) Instead, Ms. Taylor relied merely on her research on pool safety and the pool marketplace as well as her "general expertise" to prepare her report. (Pl.'s Resp. No. 43, Ex. D at 2.)

Much of Ms. Taylor's expert report cites to broad statistics that are not particular to the model of swimming pool at issue or children of Jonathan's age. For example, Ms. Taylor's report notes that from 2005 to 2007, fifty-three children under age fifteen died in above-ground swimming pools, but that it is not known how many were soft-sided rather than steel-walled pools. (Pl.'s Resp. No. 43, Ex. D at 2.) The report also refers generally to pool and spa safety standards, but never indicates that any of these standards apply to this specific case. (See id. at 2-3.) While Ms. Taylor concludes that Wal-Mart failed to provide the users of the inflatable pool product with adequate safety information, she cites to no literature or relevant standards to support her assertions. She does not explain Wal-Mart's failures with any particularity, nor does she even suggest how remedying these failures could have prevented Jonathan's injury. (See Pl.'s Resp. No. 43 Ex. D.) Most important, Ms. Taylor's report is completely void of any reference to the facts or circumstances of this case before she reaches her conclusion.

For evidence to be deemed relevant under Daubert and Federal Rule of Evidence 702, it must "help the trier of fact to understand the evidence or determine a fact in issue." Daubert, 509 U.S. at 591. This requires "a valid scientific connection to the pertinent inquiry as a precondition for admissibility." Id. at 591-92. In other words, to be admissible, Ms. Taylor's conclusions must reliably follow from the facts known to her. See Heller, 167 F.3d at 146. Given that Ms. Taylor did not review any of the facts or data in this case, her conclusions as to

what caused Jonathan's injuries are based on nothing more than her own intuition and speculation.

As such, the Court finds Ms. Taylor's testimony will not assist the trier of fact in understanding the relevant facts at issue in this particular case. Accordingly, Ms. Taylor's testimony is inadmissible as expert testimony under <u>Daubert</u> and Rule 702 and must be excluded.[10]

## C. Summary Judgment

### (1) Strict products liability

Under Pennsylvania law, a plaintiff may recover damages in an action for strict liability where a defendant's product in "a defective condition unreasonably dangerous to the user or consumer" causes harm to the plaintiff. <u>Phillips v. A-Best Products Co.</u>, 665 A.2d 1167, 1170 (Pa. 1995) (citing Restatement (Second) of Torts § 402A). Strict liability claims may rest on three different types of product defects: design defects, manufacturing defects, and failure-to-

---

[10] Although an evidentiary hearing was not requested by either party, the Court considered the issue of whether such a hearing would be necessary to decide Defendant's motions to exclude the testimony of Plaintiff's proffered experts. The Third Circuit has held that a trial court need not conduct an evidentiary hearing on a <u>Daubert</u> challenge if the record is sufficient to allow the Court to make a determination. <u>See</u> <u>Oddi</u>, 234 F.3d at 151-55; <u>see also</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999) (holding that a trial court "must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable.") As noted above, the respective expert reports directly addressed the sources that formed the basis of the conclusions in each report. More importantly, the expert reports clearly indicated that neither expert engaged in *any* independent investigation or testing of hypotheses relating to the cause of Jonathan's death. Thus, the record before the Court, consisting of the expert reports as well as the parties' discussion of the experts at oral argument, was sufficient to decide the admissibility of both experts' testimony under <u>Daubert</u>.

warn defects.  Id.  In the present case, Plaintiff advances claims under both design defect and failure-to-warn defect theories.  (See Pl.'s Compl.)

### (a) Design defect

To prove strict liability in Pennsylvania under a theory of defective design, a plaintiff must prove: (1) that the product was defective; (2) that the defect existed when it left the manufacturer's control; and (3) that the defect caused the plaintiff's harm.  Barnish v. KWI Bldg. Co., 980 A.2d 535, 541 (Pa. 2009).  In order to survive summary judgment without the testimony of Plaintiff's experts that offer conclusions on causation, Plaintiff must present sufficient evidence for a reasonable jury to find that the inflatable pool was defective and caused Jonathan's near-drowning on July 28, 2006.  Plaintiff is unable to carry this burden.

Both parties agree that no one, aside from Jonathan's autistic brother Danny[11], saw how Jonathan entered the pool or what transpired once he entered the pool before he was found by his mother, Marisol Maldonado.  Conceivably, while Jonathan could have climbed up the side of the pool or the ladder to enter, Jonathan could have also received assistance from his brother to enter the pool.  Plaintiff has offered no evidence to negate this or any other reasonable explanation for Jonathan's entry and subsequent injury.  A jury conclusion that the pool was defective, grounded solely in evidence that Jonathan was found in the pool in severe distress, could be nothing more than speculation or conjecture.  The mere physical possibility that the design of the inflatable pool may have contributed to Jonathan's death is not enough for Plaintiff to survive summary judgment on her design defect claim.  See Booth, 166 F. Supp. 2d at 222.

---

[11] Plaintiff has stipulated that Danny Delgado will be incompetent to testify at trial. (Def.'s Mot. No. 47 at 11.)

Where a plaintiff offers no proof concerning an essential element of a claim on which a party bears the burden of proof at trial, the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323-24. Without the evidence of Plaintiff's experts, Plaintiff has failed to offer sufficient evidence of causation to support her claim for strict liability under a theory of design defect; therefore, the Court grants summary judgment to Defendant on this claim.

### (b) Warning defect

As with design defect claims, a plaintiff advancing a failure-to-warn defect theory of products liability must prove: (1) that the product was sold to the consumer in a defective condition; and (2) the defect caused the plaintiff's injury. Phillips, 665 A.2d at 1171 (citing Walton v. Avco Corp., 610 A.2d 454, 458 (Pa. 1992)). To establish the second element of causation, the plaintiff "must show first that the hazardous condition of the product was a cause in fact of his injury, and then that the absence or inadequacy of warnings addressing that condition was the legal cause of his injury."[12] Coward v. Owens-Corning Fiberglas Corp. 729 A.2d 614, 619 (Pa. Super. Ct. 1999); see also Moroney v. General Motors Corp., 850 A.2d 629, 633-34 (Pa. Super. Ct. 2004). "Where the theory of liability is failure to warn adequately, the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning may have prevented the accident before the issue of causation may be submitted to the jury." Conti v. Ford Motor Co., 743 F.2d 195, 198 (3d Cir. 1984).

---

[12] To show that the hazardous condition was the cause-in-fact of an injury, a plaintiff must demonstrate that the condition was a "but for" cause of that injury. Ayers v. Johnson & Johnson Baby Products Co., 818 P.2d 1337, 1340 (Wash. 1992); see also Phillips, 665 A.2d at 1171 at n.6 (citing Ayers).

The Third Circuit addressed causation in failure-to-warn cases in Conti v. Ford Motor Company. In that case, the plaintiffs, Mr. and Mrs. Conti, alleged that the defendant, Ford, was liable for failing to warn consumers of the danger of starting a standard transmission car while in gear with the clutch engaged. Id. at 197. Ford claimed that Mr. Conti's negligence in starting the car in this condition was the cause-in-fact and proximate cause of Mrs. Conti's injuries. Id. The Court ultimately held in favor of Ford, finding that the plaintiffs had produced no evidence that Mr. Conti would have paid more attention to what he was doing if additional warnings had been provided. Id. at 198. The Court relied on the fact that Mr. Conti had been driving a standard transmission vehicle for many years by the time of the accident, and he had testified that he was aware that one would need to depress the clutch when driving a standard transmission vehicle. Id.

In the present case, regardless of whether Wal-Mart's warnings on the pool were inadequate, rendering the product defective, Plaintiff has failed to establish that such an absence of warnings caused Jonathan's injuries and subsequent death because Plaintiff and her family were well aware of the risks posed by the pool. See Sherk v. Daisy-Heddon, 450 A.2d 615, 621 (Pa. 1982) (Hutchinson, J., concurring) (stating that "[w]here the actor knows risk is present and still chooses to act without regard to it, the warning serves no purpose in preventing the particular harm"). No matter what warnings Wal-Mart made available to customers in the store or included on or with the product, those warnings would have been ineffective in deterring Plaintiff's conduct on the day of the incident.

First and foremost, Plaintiff testified during her deposition that she was well aware that a pool is an unsafe place for a child of Jonathan's age.

Q: Was there anything about the pool that made you think it was safe?

A: No.  No.  I mean a pool is a pool.

Q: And typically a pool is an unsafe place for a child Jonathan's age, right?

A: Yes.

(Pl.'s Dep. 73.)  Plaintiff also testified that she read a warning on the pool: "Danger, don't leave your child alone."  (Pl.'s Dep. 28.)

Nowhere in Plaintiff's testimony does she suggest that if additional warnings had been provided on the pool itself, she would have acted differently in the situation.  Jonathan was generally not allowed into the backyard unsupervised when the pool was present.  (Pl.'s Dep. 24.)  Plaintiff never intended that Jonathan be left unsupervised in the kitchen; three times before Plaintiff went upstairs, she asked her friend, Ms. Garcia, to watch Jonathan.  (Pl.'s Dep. 34-35.)  There is simply no evidence that suggests that had Wal-Mart provided additional warnings, Ms. Maldonado would have somehow behaved differently on the day of Jonathan's drowning.

Likewise, Plaintiff has failed to establish that her sister Diane or brother-in-law Mr. Yeager would have acted differently if presented with additional warnings about the hazards associated with the inflatable above-ground pool.  Diane and Mr. Yeager both seemed to acknowledge that children of Jonathan's age should always be supervised around pools.  (See Yeager Dep. 35, 9/4/2009; Diane Dep. 64.)  Neither Diane nor Mr. Yeager attempted to speak with any employee at Wal-Mart when they purchased the pool or read anything on the pool box before the purchase.  (Diane Dep. 17, 19-21; Yeager Dep. 16-17.)  Mr. Yeager, who assembled the pool and modified the yard to make it suitable for the pool, testified that he did not read the pool's instruction manual except for instructions on ladder assembly.  (Yeager Dep. 20, 25, 9/4/2009.)  And finally, Mr. Yeager did not conduct research on fencing requirements or

suggestions in Philadelphia, as he believed he was already aware of and complied with Philadelphia building codes. (Yeager Dep. 12-14, 9/4/2009.)

As in Conti, there is insufficient evidence in this case for a jury to reasonably conclude that additional warnings may have prevented Jonathan's injuries and subsequent death. Plaintiff was aware of the risk posed by the pool to unsupervised children and made an attempt to ensure Jonathan was supervised, with the knowledge of these risks. For the foregoing reasons, Defendant's motion will be granted as to Plaintiff's strict liability claim under a failure-to-warn theory.

*(2) Negligent product design*

In a products liability suit based on a theory of negligent product design in Pennsylvania, a plaintiff must prove: (1) the manufacturer owed a duty to the plaintiff; (2) the manufacturer breached that duty; and (3) the breach was the proximate cause of the plaintiff's injuries. Dauphin Deposit Bank and Trust Co. v. Toyota Motor Corp., 596 A.2d 845, 849-50 (Pa. Super. Ct. 1991). Unlike strict products liability claims, the plaintiff must prove fault of the manufacturer under a theory of negligent design.

Even assuming *arguendo* that Plaintiff had established the first two elements necessary to prove her negligence claim, Plaintiff is unable to prove the third element of causation. Without any expert testimony as to how Jonathan entered the pool and what caused his injuries, and without any witnesses able to testify to the same, Plaintiff simply cannot carry her burden to show that any defect in the pool proximately caused Jonathan Delgado's near-drowning and subsequent death. For the same reasons that Plaintiff failed to prove causation on her design

defect claim, Plaintiff cannot overcome summary judgment on her negligence claim. Therefore, the Court will grant Defendant's motion on Plaintiff's negligence claim.

*(3) Wrongful death, survival, negligent infliction of emotional distress*

Plaintiff's complaint also brings claims of wrongful death, survival, and negligent infliction of emotional distress. (Pl.'s Compl. 9-12.) Wrongful death and survival claims are not independent, substantive causes of action; both are strictly derivative of the underlying tortuous acts that resulted in a fatal injury. See 42 Pa. Cons. Stat. §§ 8301(a), 8302; Sunderland v. R.A. Barlow Homebuilders, 791 A.2d 384, 390-91 (Pa. Super. 2002), aff'd, 838 A.2d 662 (Pa. 2003). Likewise, in order to maintain a claim for negligent infliction of emotional distress, there must be an underlying tort. "[I]f the defendant is not liable for the personal injury to the victim, then he or she is not liable for the emotional distress caused to the relative of the victim. Liability for the personal injury is a threshold matter that must be established before liability to the bystander can be proved." Leidy v. Borough of Glenolden, 277 F. Supp. 2d 547, 568 n.20 (E.D. Pa. 2003).

Because Plaintiff has failed to overcome summary judgment on her underlying strict liability and negligence claims, Plaintiff cannot maintain these derivative claims. Accordingly, Defendant's motion is granted as to Plaintiff's claims for wrongful death, survival, and negligent infliction of emotional distress.

*(4) Punitive damages*

Finally, Plaintiff's claim for punitive damages cannot be sustained. "It is settled law that one cannot recover punitive damages independently from an underlying cause of action." DiGregorio v. Keystone Health Plan East, 840 A.2d 361, 370 (Pa. Super. Ct. 2003). In light of

the grant of summary judgment on all of Plaintiff's underlying causes of action, the Court must dismiss Plaintiff's claim for punitive damages as a matter of law.

An implementing Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARISOL MALDONADO, Individually :        CIVIL ACTION
and as Administratrix of the Estate of :
Jonathan Delgado, Deceased :
                                   :
                                   :
         v.                      :
                                   :
WALMART STORE #2141, et al.     :        NO. 08-3458

# ORDER

**AND NOW**, this 9th day of May, 2011, upon consideration of Defendants' Motions *In Limine* to preclude the testimony of Plaintiff's experts (Docs. 38, 39), Plaintiff's response thereto (Doc. 43) and Defendants' reply briefs (Docs. 46, 47); Defendants' Motion for Summary Judgment (Doc. 40), Plaintiff's response thereto (Doc. 42), Defendants' reply (Doc. 48); Plaintiff's Supplemental Brief (Doc. 51); and the parties' oral argument on January 5, 2011, it is hereby **ORDERED** that:

(1) Defendants' Motions *In Limine* are **GRANTED** as to the testimony of Alison Osinski (Doc. 38) and Erika Taylor (Doc. 39).

(2) Defendants' Motion for Summary Judgment (Doc. 40) is **GRANTED**.


BY THE COURT:


 /s/ L. Felipe Restrepo
L. FELIPE RESTREPO
UNITED STATES MAGISTRATE JUDGE